OSCN Found Document:JC FAB, INC. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 JC FAB, INC. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION
2015 OK CIV APP 50
Case Number: 112157
Decided: 04/27/2015
Mandate Issued: 05/20/2015
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2015 OK CIV APP 50, __ P.3d __

 
JC FAB, INC., Plaintiff/Appellee,
v.
STATE OF OKLAHOMA, ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION, Defendant/Appellant.
APPEAL FROM THE DISTRICT COURT OF 
BRYAN COUNTY, OKLAHOMA
HONORABLE MARK R. CAMPBELL, TRIAL JUDGE
AFFIRMED
Thomas N. Marcum, BURRAGE LAW FIRM PLLC, Durant, Oklahoma, for Plaintiff/Appellee
Robert C. Newark, III, ASSISTANT GENERAL COUNSEL, OKLAHOMA EMPLOYMENT SECURITY COMMISSION, Oklahoma City, Oklahoma, for Defendant/Appellant
DEBORAH B. BARNES, JUDGE:
¶1 Defendant/Appellant State of Oklahoma, ex rel. Oklahoma Employment Security Commission (the Commission) appeals the district court's Order reversing the decision of the Commission's Assessment Board. The Assessment Board found Plaintiff/Appellee JC Fab, Inc. (JC Fab) is a successor employer of Texoma Waste Control (Texoma), and the district court reversed. Based on our review, we conclude the Assessment Board's determination that, under 40 O.S. 2011 § 3-111(A), JC Fab "continue[d] the operations" of Texoma "as a going business" is not supported by substantial evidence. Therefore, we affirm the district court's Order reversing the order of the Assessment Board.
BACKGROUND
¶2 JC Fab and Texoma entered into a "Commercial/Industrial Real Estate Purchase Contract" in May, 2011, in which they agreed that for $1.8 million, JC Fab would acquire the real property and certain personal property of Texoma. One year later, the Commission notified JC Fab, by letter, of its finding that "[JC Fab] has acquired substantially all of the organization, employees, trade, business or assets of Texoma . . . , and continued the operations of the predecessor as a going business." The Commission stated that "it has therefore been determined . . . that [JC Fab] is a successor to the account of the predecessor," and that JC Fab would, therefore, "acquire the merit rating account" of Texoma, including Texoma's "actual contribution and benefit experience, annual payrolls, and liability for current or delinquent contributions, interests and penalty."
¶3 The Commission's finding was made after a part-time employee of JC Fab submitted a form to the Commission entitled "Employer's Notice of Acquisition of Business." In this form, JC Fab appeared to represent it had "acquired substantially all of the trade, organization, employees, business or assets of [Texoma] . . . effecitive 8/12/11[,] and continued the operations of the predecessor as a going business." (Emphasis added.) However, after receiving the Commission's letter in May, 2012, JC Fab, by letter dated May 23, 2012, from its managing member, Scott Crain (Crain), "formerly disagree[d]" with the Commission's findings and requested a review and redetermination. Crain specifically stated in the May 2012 letter, in part, as follows: "I acquired [Texoma's] equipment and the real estate that [it] leased, to expand my existing business and not to continue [Texoma's] operation as a going business." Crain also stated in his May 2012 letter, as follows:


I did hire [Texoma's] existing employees which totaled 14 persons, of which only 5 remain. The other 9 left within the first few months of their initial employment with [JC Fab]. We currently have approximately 80 employees. It does not seem equitable or fair that the merit rating of 5 former employees of [Texoma] should affect 80 employees of my company.


¶4 By letter dated July 23, 2012, the Commission noted, among other things, that "[Texoma] produced waste containers as does [JC Fab]," and the Commission stated it had decided to uphold its previous determination that JC Fab was a successor. In response, JC Fab submitted a written protest and a request for a hearing before the Assessment Board. 
¶5 A telephonic hearing was held before a hearing officer of the Assessment Board on September 7, 2012. At the hearing, Crain testified on behalf of JC Fab, and Theresa Capolino (Capolino), a compliance officer for the Commission, testified on behalf of the Commission. On the same date as the hearing, the Assessment Board entered its order finding JC Fab is a successor employer of Texoma under 40 O.S. 2011 § 3-111(A). The Assessment Board noted that a successor employer, under § 3-111(B), may request that only a portion of the experience rating of the previous employer be applied, but stated that JC Fab failed to make such a request within 120 days of the acquisition as required under § 3-111(B). That is, the Assessment Board stated: "Although the employer asserts that they make a different type of refuse container than the previous employer and that percentage of their sales is small, they did not request that consideration within the 120 days of acquisition . . . ." The Assessment Board found that because JC Fab "did continue to operate as a manufacturer of refuse containers, in addition to the other manufacturing products they produce, they did continue similar operations of the previous employer," and that JC Fab "is a successor employer."
¶6 JC Fab appealed the Assessment Board's order to the district court. The district court, in its Order filed in August, 2013, reversed the Assessment Board's order, noting that JC Fab "did not have a non-competition agreement with [Texoma]. This fact, combined with all of the other evidence, establishes . . . that [JC Fab] was not a successor to the business known as [Texoma]."
¶7 The Commission now appeals the district court's Order reversing the order of the Assessment Board.
STANDARD OF REVIEW
¶8 The Employment Security Act of 1980 sets forth the standard of judicial review in appeals of Assessment Board decisions as follows: 


In any judicial review under this part the findings of the Commission, or its duly authorized representative, as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law.


40 O.S. 2011 § 3-404 (emphasis added). 


The Oklahoma Supreme Court has determined the phrase, "if supported by evidence," as found in § 3-404, "means evidence which is substantial, that is, affords a substantial basis in fact from which the fact in issue can be reasonably inferred." Oklahoma Employment Sec. Comm'n v. Sanders, 1954 OK 155, 272 P.2d 379. The Court went on to state it was Commission's function to weigh the evidence and make findings, which findings must be accepted on judicial review if supported by substantial evidence and not clearly erroneous. 


Snider Bros. v. State ex rel. Okla. Employment Sec. Comm'n, 2008 OK CIV APP 80, ¶ 14, 194 P.3d 771. 


The words "if supported by evidence" mean substantial evidence. [Sanders], 1954 OK 155, ¶¶ 8-9 . . . . Substantial evidence is "evidence . . . [that] affords a substantial basis in fact from which the fact in issue can be reasonably inferred" or "a reasonable mind might accept as adequate to support a conclusion." Id.


Reliable Referring Serv., Inc. v. Assessment Bd., 2006 OK CIV APP 150, ¶ 6, 149 P.3d 1078. See also Dugger v. State ex rel. Okla. Tax Comm'n, 1992 OK 105, ¶ 9, 834 P.2d 964 ("The appellate courts will review the entire record made before an administrative agency acting in its adjudicatory capacity to determine whether the findings and conclusions set forth in the agency order are supported by substantial evidence," and "[a]n adjudicatory order will be affirmed on appeal if the record contains substantial evidence in support of the facts upon which the decision is based and the order is otherwise free of error.").
¶9 "The Commission, however, may not arbitrarily discredit and disregard unimpeached, competent and relevant testimony which is uncontradicted." Sanders, 1954 OK 155, ¶ 9. See also Wright & Edwards v. Okla. Employment Sec. Comm'n, 1997 OK 163, ¶ 24, 934 P.2d 1088 ("We stated, in [Sanders], that the function of the employment security commission is to weigh the evidence on matters properly before it and make findings thereon, and where such findings are supported by substantial evidence or are not clearly erroneous, they must be accepted, but that the Commission may not arbitrarily discredit and disregard unimpeached competent and relevant testimony that is uncontradicted.").
ANALYSIS
¶10 Title 40 O.S. 2011 § 3-111(A)[1] provides, in part, as follows:


Any employing unit, whether or not an employing unit at the time of the acquisition, which acquires substantially all of the trade, organization, employees, business, or assets of any employer (excepting in such case any assets retained by that employer incident to the liquidation of the employer's obligations) and who continues the operations of the predecessor employer as a going business, shall be determined to be a successor employer. The successor employer shall acquire the merit rating[2] account of the predecessor employer, including the predecessor's actual contribution and benefit experience, annual payrolls, and contribution rate. The successor employer shall also become jointly and severally liable with the predecessor employer for all current or delinquent contributions, interest, penalties and fees owed to the [Commission] by the predecessor employer.


(Emphasis added.) The dispositive issue presented on appeal is whether the Assessment Board's determination that JC Fab continued the operations of Texoma as a going business is supported by substantial evidence.
¶11 Regarding whether JC Fab continued the operations of Texoma as a going business, Crain testified at the Assessment Board hearing that, prior to the acquisition, JC Fab "built jacks and couplers for the gooseneck trailer industry. We built safe rooms, storm shelters. We did custom fabrication work for other manufacturers. We did a machine shop business. And we built oil field equipment, such as frac tanks and mud tanks." He also testified JC Fab had "a small line of open top refuse containers" prior to the acquisition. Crain testified that the production of refuse containers constituted "[l]ess than five percent, maybe one or two percent. It was a very small part of our business." He stated that as of the date of the hearing, and after the acquisition, the portion of JC Fab's business related to the production of refuse containers was "[p]robably less than five percent if - you know, two to three percent, probably." Crain stated that Texoma, on the other hand, "did 100 percent compactors," meaning Texoma only produced "hydraulically powered" waste compactors "used behind restaurants, department stores, anybody wanting to compact refuse for volume purposes." 
¶12 Crain testified that JC Fab's sales in the past 12 months were "[p]robably right around, I think, seven or eight million," and that "[r]oughly, $100,000 to $200,000" of that was from the production of refuse containers. When questioned how much Texoma was generating from sales of refuse containers prior to the acquisition, Crain, who testified that Texoma had shown him their financial statements "[w]hen I was discussing buying their assets . . . to show how much equipment they had," stated that Texoma was "doing close to $2 million a year in sales" of refuse containers. The following exchange occurred between Crain and JC Fab's attorney:


[Q] Do you have any reason to believe that, if you had purchased [Texoma] and continued that operation, that you would have done anything different than their $2 million?
[A] I probably - if we would have taken over that part of the business, it probably would have increased, but that wasn't our plan.
The oil field work that we do and the work that we do for one of our largest customers is Caterpillar, is what - that's more profitable, and that's what our focus is. But we've chosen not to do [refuse compactors].
We've turned down several opportunities to bid jobs that [Texoma] had built products. And, because we don't have the time and we're - our backlog is filled up. Our capacity is filled up doing oil field equipment work right now.


¶13 Regarding sales of refuse compactors, Crain testified, "we have never got into that type of business," but admitted that after the acquisition, JC Fab 


continued [production of compactors] in a very small way. We don't do any compactors on a continuous basis. But there's . . . two old [Texoma] customers that, occasionally, will place orders. And we do it more as a service to them. But we don't advertise it. We don't have a salesman out on the road selling those. It's not part of our business plan, as a whole.


Crain further testified that JC Fab kept, and did not change, the telephone and fax numbers at the facility acquired from Texoma, and that previous customers of Texoma would


call in, periodically, asking us if we can build them a compactor or sell them some parts . . . - and . . . I've lived in this community and worked in it for over 40 years. And, you know, as a service to their older . . . customers, we try to help them out.
. . . . So, you know, we try to provide a service for them. But it's not part of our business model.


Crain also responded in the negative when questioned, "Did you, on behalf of JC Fab, or any of your employees, to your knowledge, contact previous customers of [Texoma] to make sales?"
¶14 When questioned at the hearing, "If you weren't going to continue building the powered refuse containers that [Texoma] built, why did you buy their assets?" Crain responded, 


For their facility. The biggest and only reason that we bought [Texoma] assets is because the year prior to that, we had got into building frac paint (sic),[3] and our existing building that we were in was too small. . . . And I needed some real estate and some buildings and welding machines.


Crain stated that the acquisition occurred "to expand our frac paint (sic) business." He similarly testified that "we were using the new assets solely for the use of our existing business and to build the products that we were already currently building."
¶15 Crain further testified, consistent with the "Addendum to Purchase Contract" contained in the record, that there were a number of Texoma assets "that all had to do with [Texoma's] existing business" that JC Fab did not purchase, including "hoists," "tarpers and tarps," and "truck chassis." The following exchange occurred between Crain and JC Fab's attorney:


[Q] If you had continued to make the products that [Texoma] made, would you have had to have tarpers and tarps?
[A] Yes.
. . . .
[Q] Okay. Would those truck chassis have been used in the refuse container business that [Texoma] did?
[A] Yes.
[Q] And that's a different business than JC Fab was involved in; is that correct?
[A] Exactly.


Regarding the hoists that JC Fab did not purchase, Crain explained that JC Fab does not use them for "the frac tanks that we build . . . . We - our containers that we build are pulled by trucks. And these containers are pulled up onto trucks and dumped. So it's a totally different business model than JC Fab." When questioned whether, if JC Fab had continued producing the type of refuse containers that Texoma built, it would have purchased the hoists, Crain responded, "Yes. We would have needed these assets, but that wasn't, again, part of our business plan." 
¶16 Crain explained that "[b]asically, everything we bought from [Texoma] [-] the real estate . . . and then the equipment . . . that we bought[,] . . . the welding machines, drill presses, press brakes . . . [-] were generic fabrication equipment, the same type of equipment that we already owned, but more of it. More welding machines, more press brakes. And then their facility." He further explained,


I didn't buy anything related to, specifically, for what [Texoma was] doing.
The welding machines, and I think you can understand, like the equipment I bought, like the welding machines weld the metal together, no matter what shape it is. So I could use it in my business. The sheers or the pressed brake cut metal and bend it. So it's very universal.


¶17 Crain testified that, prior to the acquisition, JC Fab had a building that was "[r]oughly, 16,000 square feet," and that through the acquisition "[w]e added 63,000 square feet." Crain testified: 


The whole point of buying this building and this equipment was to grow. And, as we got into that building, we got - we've had large orders for frac paints (sic) and oil field related stuff. We've hired new people. It was all part of our move to buy that building and our expansion.


¶18 In addition, the following exchange occurred between Crain and JC Fab's attorney:


[Q] At the time you acquired [Texoma] assets, how many employees did they have?
[A] I'm going to - to the best of my knowledge, I think it was 15 to 16 employees.
[Q] Okay. Did you hire all of those employees to work at JC Fab?
[A] We gave most of them an opportunity to come work for us when [Texoma] shut down. And I think the majority of them did, initially. But several of them quit right after for various reasons. But - and we're down to just a few of them right now.
[Q] Could some of the reasons be that you weren't building the products they were used to building?
[A] That's exactly right. The products that we're building that are oil field related and the stuff that we're doing for Caterpillar required extensively more experience in welding, the type of welding procedures, and the work force at [Texoma] was very nonskilled, seasonal-type workers. And, you know, they weren't able to do the work that we needed. And most of them have moved on and found other jobs.


¶19 Crain also testified that he "didn't require [Texoma] to sign a noncompete clause or prohibit them from going on and doing anything related to that business, because I wasn't getting into that business." He stated that Texoma could start up the same business they were running before the acquisition "and I wouldn't have a problem with it whatsoever. We wouldn't even be competing."
¶20 Crain's testimony was neither impeached nor contradicted at the hearing. The only witness who testified on behalf of the Commission at the hearing was its own employee, Capolino, who investigated the acquisition and made the initial determination that JC Fab was a successor of Texoma. However, Capolino testified that she determined JC Fab continued the operations of Texoma as a going business based merely on the fact that "[Texoma] produced refuse containers. And JC Fab also produces refuse containers." She similarly testified, "[JC Fab] still made some of the product that [Texoma] made." 
¶21 On cross-examination, Capolino admitted that during her investigation, she did not determine, for example, what percentage of Texoma's business was the production of refuse containers; whether any of the Texoma owners, shareholders, or board members continued to be a part of JC Fab; or how much of JC Fab's business consisted of sales to Texoma account holders. She testified, "I made my determination [based] on the amount of assets that [JC Fab] acquired and the employees," and took "into consideration the fact that Texoma made refuse containers and the fact that JC Fab also made refuse containers." She stated, "I did not have a lot of information."
¶22 As quoted above, the Commission "may not arbitrarily discredit and disregard unimpeached, competent and relevant testimony which is uncontradicted." Sanders, 1954 OK 155, ¶ 9. Here, Crain's testimony supports only one reasonable conclusion: that JC Fab did not "continue[] the operations of the predecessor employer as a going business[.]" Crain testified that JC Fab acquired Texoma's facility along with a substantial portion of its assets not in order to continue Texoma's $2 million per year refuse compactor business but, instead, to expand its own, distinct metalworking business, especially as it relates to the oil and gas industry. Crain did testify, as set forth above, that JC Fab's production of refuse containers increased after the acquisition from "maybe one or two percent" to "two to three percent, probably," and that "[r]oughly, $100,000 to $200,000" of its "seven or eight million" in sales over the past 12 months before the hearing was from the production of refuse containers. However, Crain testified that this increase was the result of a de minimis "service" to two former Texoma customers; that it was not performed on a regular basis; that it was not advertised by JC Fab; that it was not part of JC Fab's business plan; that JC Fab did not, though it could have, continue to generate, or exceed, anywhere near the $2 million per year in sales of refuse compactors that Texoma generated before the acquisition; and that JC Fab did not acquire various assets of Texoma that would have been necessary to continue Texoma's refuse container sales as a going business. Moreover, Crain testified there was no noncompete clause with Texoma because JC Fab did not care if Texoma continued to manufacture its refuse containers as JC Fab was not in Texoma's product line.
¶23 In turn, the Commission did not assemble competent evidence to contradict, discredit, or impeach Crain's testimony. Instead, the Commission's only witness testified, in essence, that, from a certain remove, and absent "a lot of information," it appears JC Fab is a successor of Texoma and is continuing its operations as a going business. However, although this may have been a reasonable conclusion at the early stages of this case, the uncontradicted details elicited at the hearing reveal otherwise.[4] 
¶24 We must conclude, with the district court, that the Assessment Board's determination is not supported by substantial evidence. In particular, the Assessment Board's determination that, under § 3-111(A), JC Fab "continue[d] the operations" of Texoma "as a going business" is not supported by substantial evidence. Consequently, we affirm the district court's reversal of the Assessment Board's order.
CONCLUSION
¶25 We conclude the Assessment Board's determination that, under 40 O.S. 2011 § 3-111(A), JC Fab "continue[d] the operations" of Texoma "as a going business" is not supported by substantial evidence. Therefore, we affirm the district court's Order reversing the order of the Assessment Board.
¶26 AFFIRMED.
RAPP, P.J., and THORNBRUGH, J., concur.
FOOTNOTES
[1] After the decision of the Assessment Board, and after the reversal of the Assessment Board's order by the district court in its Order filed in August, 2013, § 3-111 was amended by laws effective November 1, 2013. However, we note that the language contained in § 3-111(A) was not changed in any manner significant to this appeal. But see n.2, infra. 
[2] We note that the 2013 amendment to § 3-111 changed the phrase "merit rating" in this sentence to "experience rating." 
[3] We note that although transcribed as "frac paint" in the hearing transcript, Crain was possibly referring, as he did earlier, and later, at the hearing, to "frac tanks." 
[4] We note that the Assessment Board, in its order, also relies upon nonspecific facts, such as that JC Fab "did continue similar operations of the previous employer." The Assessment Board's order also appears to rely upon certain irrelevant findings, such as that JC Fab "kept the same location since they wished to purchase the property and facility from the previous employer," and that "[Crain] testified that the previous employer could 'conceivably' continue their business provided they only kept two welders and no presses to manufacture the refuse containers but did not sell the equipment specific to the compactor portion of the refuse container manufacturing." Immediately following recitation of this latter finding in its order, the Assessment Board concluded, "[JC Fab] is a successor employer."




 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2006 OK CIV APP 150, 149 P.3d 1078, RELIABLE REFERRING SERVICE, INC. v. ASSESSMENT BOARD
Discussed
 2008 OK CIV APP 80, 194 P.3d 771, SNIDER BROS., L.L.C. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1992 OK 105, 834 P.2d 964, 63 OBJ 2135, Dugger v. State ex rel. Oklahoma Tax Com'n
Discussed
 1954 OK 155, 272 P.2d 379, OKLAHOMA EMPLOYMENT SECURITY COM'N v. SANDERS
Discussed at Length
 1997 OK 163, 934 P.2d 1088, 68 OBJ 915, WRIGHT & EDWARDS v. OKLAHOMA EMPLOYMENT SECURITY COMM.
Discussed
Title 40. Labor
 Cite
Name
Level

 40 O.S. 3-111, Successor and Predecessor Employers
Discussed at Length
 40 O.S. 3-404, Commission's Conclusions of Facts Conclusive
Cited